United States Court of Appeals,

Fifth Circuit.

No. 96-30600.

Letetia JEFFERSON, Individually and as Duly Qualified Legal
Tutrix for Schanta Jefferson, Plaintiff-Appellant,

v.

LEAD INDUSTRIES ASSOCIATION, INC.;  NL Industries, Inc.;
Atlantic Richfield Company;  Sherwin Williams;  SCM Corporation;
Glidden Company;  Fuller-O'Brien Corp., Defendants-Appellees.

March 12, 1997.

Appeal from the United States District Court for the Eastern
District of Louisiana.

Before JOLLY, JONES and WIENER, Circuit Judges.

PER CURIAM:

This diversity jurisdiction case was filed in federal district

court by Plaintiff-Appellant Letetia Jefferson, individually and as

duly qualified legal tutrix of Schanta Jefferson, and as the

purported representative of the class of all Louisiana parents of

children who suffered from lead poisoning resulting from exposure

to lead paint pigment before they attained the age of six years.

The suit implicates the Louisiana Products Liability Act (LPLA),[1]

under which Jefferson sought recovery against a number of

manufacturers of lead paint pigment (the Manufacturers)[2] and their

trade association (the Association).[3]  She also sought recovery on

---

[1]La.Rev.Stat. Ann. 9:2800.52 *et seq.*  (West 1991).

[2]Defendants-Appellees NL Industries, Inc., Atlantic Richfield
Company, Sherwin Williams, SCM Corporation, Glidden Company, and
Fuller-O'Brien Corp.

[3]Defendant-Appellee Lead Industries Association, Inc.

alternative theories based on non-LPLA grounds. On appeal, Jefferson seeks reversal of the district court's dismissal of her complaint against the Manufacturers under Federal Rule of Civil Procedure 12(b)(6), primarily for failure to state a claim under the LPLA, due to her inability to identify which of the Manufacturers actually made the particular lead paint pigment that caused the alleged injuries, and secondarily due to the unavailability of a cause of action grounded in civil conspiracy. She also appeals the dismissal of her claim against the Association, resulting from the fact that it is not a manufacturer and thus not amenable to liability under the LPLA. Additionally, Jefferson now urges on appeal that we should certify two key questions of law to the Louisiana Supreme Court. For the reasons set forth below, we decline Jefferson's invitation to certify and we affirm the order of the district court dismissing her action pursuant to Rule 12(b).

I

CERTIFICATION

Jefferson has filed a motion with this court asking that, pursuant to Louisiana Supreme Court Rule XII § 1, we certify questions to that court, regarding the LPLA and Louisiana Civil Code Article 2324. Specifically, Jefferson's motion asks us to certify the following two questions:

1. If a small group of defendants-manufacturers act in concert to produce a completely fungible product which is defective within the meaning of the Louisiana Products Liability Act, La. R.S. 9:2800.52 *et seq.,* and if those defendants are also guilty of a breach of express warranty under the LPLA, can those defendants be held liable for damage caused by that

product, even if the plaintiff cannot identify the specific defendant who manufactured that portion of the product that injured him?

2. Can the defendant be held solidarily liable under the civil conspiracy provisions of Louisiana Civil Code Article 2324, or, alternatively, can the defendants be liable for their share of the market of that wholly fungible product?

In support of certification, Jefferson's brief notes that (1) "[t]he issue of a completely fungible product in the context of the LPLA has never been decided by any Louisiana court," (2) the LPLA does not "specifically address the issue of allocation of fault among manufacturers who combine to produce a single defective product," and (3) the question whether defendants should be liable in solido under Article 2324 is an issue not addressed by the LPLA or, to date, the jurisprudence of Louisiana. Jefferson contends, in the alternative, that questions addressing the foregoing issues should be certified because the Louisiana Supreme Court has never ruled on the applicability of market share liability.[4]

In opposing certification, the Defendants contend, inter alia, that (1) there is no discrete question of law to certify, (2) there is no genuine uncertainty with respect to state law, (3)

---

[4]The market share theory would abrogate the requirement that a products liability claimant identify the manufacturer of the damage-causing product and replace it by imposing pro rata liability in the ratio of the market share of each manufacturer of a fungible product that is so generic that the individual manufacturer cannot be identified. The key element enabling complainants to recover under the market share theory in a fungible products case is the shift of the burden of proof from the plaintiff to the defendants-manufacturers, requiring them to show that they did *not* manufacture the offending product. *See Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980).

certification is not available as a means of changing existing circuit precedent, (4) Louisiana's unique position as a civil law jurisdiction mandates that the legislature rather than the courts adopt new theories of liability, and (5) a plaintiff's initial election to sue in federal court should proscribe his efforts to turn to the state supreme court for guidance after he loses his case in federal district court.

As a general proposition we are chary about certifying questions of law absent a compelling reason to do so; the availability of certification is such an important resource to this court that we will not risk its continued availability by going to that well too often. Alone, the absence of a definitive answer from the state supreme court on a particular question is not sufficient to warrant certification. Rather, we must "decide the case as would an intermediate appellate court of the state in question if ... the highest court of the state has not spoken on the issue or issues presented."[5] So, absent genuinely unsettled matters of state law, we are reluctant to certify.[6]

Before liability may be imposed, under the LPLA, a plaintiff must show proximate causation ---- a link between the actions of a

---

[5]*Transcontinental Gas Pipeline Corp. v. Transportation Ins. Co.,* 958 F.2d 622, 623 (5th Cir.1992); *see also Swearingen v. Owens-Corning Fiberglas Corp.,* 968 F.2d 559, 564 (5th Cir.1992) (refusing to certify question even though state supreme court had not directly confronted issue, when "under the plain language of [the statute], [the] decisional analysis is relatively straightforward").

[6]*See DiPascal v. New York Life Ins. Co.,* 749 F.2d 255, 260 (5th Cir.1985).

4

manufacturer and the injury-causing product.[7] The clear guidance provided by this requirement counsels against certifying Jefferson's proffered question to the Louisiana Supreme Court.

Neither is certification a proper avenue to change our binding precedent.[8] Albeit prior to the adoption of the LPLA, we have previously considered and rejected market share liability in Louisiana products liability cases.[9] Since those precedents were established, there has been no change in the Louisiana jurisprudence either before or after adoption of the LPLA, and the failure of the Louisiana legislature to embrace market share liability when it confected the LPLA or by subsequent amendment implies continued rejection of that theory by Louisiana. This, in turn, weighs heavily against certification.

Although not alone dispositive, Jefferson's choice of forum cannot be ignored. By filing suit in federal court, Jefferson consciously exercised her option to litigate in either state or federal court when she chose the latter. That her electing to file in federal court might have been done in anticipation of removal by the defendants is of no moment: "[T]he court should be slow to

---

[7]La.Rev.Stat. Ann. § 2800.54.A (West 1991).

[8]*See Lee v. Frozen Food Express, Inc.,* 592 F.2d 271, 272 (5th Cir.1979).

[9]*Thompson v. Johns-Manville Sales Corp.,* 714 F.2d 581, 583 (5th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984); *Bateman v. Johns-Manville Sales Corp.,* 781 F.2d 1132, 1133 (5th Cir.1986) ("Although the plaintiffs request it, we decline to certify the question to the Louisiana Supreme Court. *Thompson* disposes of the question whether to adopt market share theory....").

honor a request for certification from a party who chose to invoke federal jurisdiction."[10]

We do not lightly abdicate our mandate to decide issues of state law when sitting in diversity, and in the same vein "[w]e use much judgment, restraint and discretion in certifying" cases to the highest state court.[11] When we view the certification sought by Jefferson in light of the foregoing factors and policy considerations, we are satisfied that this case is not a viable candidate for certification. We therefore deny Jefferson's motion to certify. If the inapplicability of either the market share or the civil conspiracy theories of recovery in Louisiana products liability cases is to be changed to make either or both of those theories pertinent, such change should come from the legislature as the primary source of Louisiana law or from the highest court of that state as a secondary source of law, not from a federal court sitting in diversity.

## II

## RULE 12(b)(6) DISMISSAL

In our *de novo* review of the district court's dismissal of

---

[10]17A Charles A. Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice and Procedure § 4248, at 176 (1988); *see also, e.g., Tidler v. Eli Lilly & Co.,* 851 F.2d 418, 426 (D.C.Cir.1988); *National Bank v. Pearson,* 863 F.2d 322, 327 (4th Cir.1988); *Seaboard Sur. Co. v. Garrison, Webb & Stanaland, P.A.,* 823 F.2d 434, 438 (11th Cir.1987); *Colonial Park Country Club v. Joan of Arc,* 746 F.2d 1425, 1429 (10th Cir.1984); *Cantwell v. University of Mass.,* 551 F.2d 879, 880 (1st Cir.1977).

[11]*Florida ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 274 (5th Cir.), *cert. denied,* 425 U.S. 930, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976) (quoting *Barnes v. Atlantic & Pacific Life Ins. Co.,* 514 F.2d 704, 705 n. 4 (5th Cir.1975)).

Jefferson's claim, we conclude that the district court not only reached the correct result but did so for the correct reasons. Moreover, we are satisfied that we could not improve on the analysis of the district court as set forth in Judge Vance's clear, concise, and thorough *ORDER AND REASONS* filed on May 31, 1996. We therefore incorporate her opinion herein by reference and attach a copy hereto as Appendix A.

III

CONCLUSION

Jefferson's action is governed by the LPLA which expressly provides "the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this chapter."[12] Thus Louisiana law eschews all theories of recovery in this case except those explicitly set forth in the LPLA. That in turn leaves as the sole question on appeal whether, under the allegations of her amended complaint, Jefferson could prove any set of facts that would entitle her to relief despite the absence of any allegation identifying the particular manufacturer of the lead paint pigment products purported to have caused the injury of which she complains.[13] For the reasons more specifically set forth by the

---

[12]La.Rev.Stat. Ann. § 9:2800.52 (West 1991).

[13]Jefferson may well be correct in insisting that, without making either the market share or civil conspiracy theories available, there will continue to exist a category of products liability claims that, on the one hand, can look only to the LPLA as the exclusive source of theories of manufacturers' product

district court, we therefore affirm its dismissal of Jefferson's action;  and for the reasons we have set forth above, we decline her invitation to certify her proposed questions to the Louisiana Supreme Court.

AFFIRMED;  Motion to certify DENIED.

APPENDIX A

United States District Court

Eastern District of Louisiana

Letetia JEFFERSON, et al.

v.

LEAD INDUSTRIES ASSOCIATION, INC., et al.

Civil Action

No. 95-2835

Section "R"

*ORDER AND REASONS*

---

liability in Louisiana, but which, on the other hand, can never state a compensable cause of action under the LPLA. She refers to those situations in which the plaintiff's injury is alleged to have been caused by a fungible product made and marketed by two or more manufacturers, and thereby making it impossible to identify the particular manufacturer or manufacturers which actually made the product that caused plaintiff's injury.  We agree that under existing case law and our decision today, the plaintiff's complaint in such fungible products cases cannot possibly contain allegations that would satisfy the proximate cause element of the manufacturer's product liability under the LPLA, and thus can never state a claim on which relief could be granted to the plaintiff. But the existence of such a lacuna ---- whether legislatively intentional or accidental ---- is not a valid reason for us to alter our conclusion that, as a matter of law, neither the market share theory nor the civil conspiracy theory is a presently available alternative to the requirement that, to successfully plead the proximate cause element in a Louisiana products liability case, the plaintiff must identify the particular manufacturer of the product that causes the injury.

8

This matter is before the Court on defendants' Atlantic Richfield Company, NL Industries, Inc., Sherwin-Williams Company, SCM Corporation, Glidden Company, Fuller-O'Brien Corporation, and Lead Industries Association, Inc. ("defendants") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b), and on the Motion of defendants Glidden Company, Atlantic Richfield Company, Fuller-O'Brien Corporation, NL Industries, Sherwin-Williams Company, and Lead Industries Association, Inc. to Dismiss the Complaint Based Upon Failure to Identify the Manufacturer. The Court heard argument on these motions on April 18, 1996. For the reasons set forth below, defendants' motions are granted.

1. *BACKGROUND*

Plaintiff Letetia Jefferson, individually and as the duly qualified legal tutrix of Schanta Jefferson ("plaintiff"), filed this action for damages resulting from Schanta Jefferson's alleged lead poisoning by ingestion, absorption or inhalation of lead paint pigment. Plaintiff purports to represent a class of all Louisiana parents of children who suffered from lead poisoning from lead paint pigment before they attained the age of six years. Named as defendants are six entities that produced and sold lead paint pigment, together with the Lead Industries Association, Inc., a trade association to which the pigment defendants allegedly belonged. Plaintiff's complaint asserts liability against defendants under a number of legal theories.

Defendants have filed two motions to dismiss the complaint, as amended. The first motion asserts that the complaint is fatally

9

defective because plaintiff has not identified the manufacturer of the lead paint pigment whose product caused her injury. The second motion asserts that the amended complaint is deficient under the Louisiana Products Liability Act ("LPLA"), which states the exclusive grounds of recovery against a manufacturer of an allegedly defective product. Because the Court agrees that the LPLA states the exclusive theories on which liability may be imposed on a manufacturer of a defective product, and because Louisiana law requires that plaintiff identify the manufacturer whose product caused her injury, the Court orders the amended complaint dismissed against the paint pigment manufacturers for failure to state a claim. The amended complaint is likewise ordered dismissed against the Lead Industries Association, Inc. for the reasons stated below.

2. *THE COMPLAINT*

The amended complaint contains hardly any allegations concerning the circumstances of Schanta Jefferson's lead poisoning, other than to assert that she contracted lead poisoning before she reached the age of six because of "ingestion, absorption or inhalation of lead paint pigment." Complaint at ¶ 10. There are no allegations of where or how she came into contact with the lead paint pigment. Further, she does not allege, and states that she cannot allege, the identity of the manufacturer of the paint pigment that caused her injury. Nor does she assert when the lead paint pigment was applied to whatever it was that she came into contact with containing lead paint pigment. In her opposition

10

memorandum, plaintiff refers to lead paint pigment on the walls of her apartment as the source of her contamination, but this is not alleged in the complaint.

Rather, plaintiff alleges that defendants marketed most of the lead paint pigments used in lead based paints that were sold in the United States between the early part of the twentieth century and the early 1970's, when lead paint pigment was outlawed for residential purposes. Amended Complaint at WW 15, 21 and 36. The complaint alleges that lead paint pigment remains in a large majority of residences built before the early 1970's, posing a health risk to children. *Id.* at ¶ 21. Plaintiff asserts that from the early part of the twentieth century through at least the late 1950's, defendants conspired to promote lead paint pigment in residential paint, despite their knowledge of its unreasonable health risks to children. Plaintiff claims that defendants misrepresented the product as safe and failed to disclose or warn of its known health risks. Plaintiff's asserted theories of recovery are: the manufacture and sale of an unreasonably dangerous product, defective design, negligence, failure to warn, breach of express warranty, breach of express or implied warranty of fitness for a particular purpose, fraud by misrepresentation, market share liability and civil conspiracy. *Id.* at WW 23-57.

3. *LEGAL ANALYSIS*

The standard to be applied to a motion to dismiss under Federal Rule 12(b)(6) is a familiar one. The district court must take the factual allegations of the complaint as true and resolve

11

any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n.,* 987 F.2d 278, 284 (5th Cir.1993). The complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of her claim that would entitle her to relief. *Fernandez-Montes,* 987 F.2d at 284, 285; *Leffall v. Dallas Independent School District,* 28 F.3d 521, 524 (5th Cir.1994). However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss. *Fernandez-Montes,* 987 F.2d at 284; *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

### a. Louisiana Products Liability Act
### *- Lead Pigment Manufacturers*

No party disputes that this motion is to be decided under Louisiana law or that the Louisiana Products Liability Act applies to plaintiff's claims.[14] At issue is whether plaintiff may assert theories of recovery against a manufacturer of an allegedly defective product that are not recognized by the LPLA and whether plaintiff must identify the manufacturer of the product causing her

---

[14]The LPLA became effective on September 1, 1988 and applies to those causes of action that accrued on or after September 1, 1988. *See* La. Acts No. 64, § 2 (West 1988); *Brown v. R.J. Reynolds Tobacco Co.,* 52 F.3d 524, 526 (5th Cir.1995). Plaintiff filed another suit against her landlord, the Housing Authority of New Orleans ("HANO"), in which she alleges that Schanta Jefferson was born on July 1, 1992, approximately four years after the effective date of the LPLA. The Court may take judicial notice of the contents of public records on a Rule 12(b)(6) motion. *E.g., Fortney v. Petron, Inc.,* 1992 WL 236936 at *1 (E.D.La. Sept.1, 1992). Hence, the LPLA clearly applies to Jefferson's claims.

injuries in order to recover.

The Louisiana Products Liability Act "establishes the exclusive theories of liability for manufacturers for damages caused by their products." La.Rev.Stat. Ann. § 9:2800.52 (West 1988); *Brown v. R.J. Reynolds Tobacco Co.,* 52 F.3d 524, 526 (5th Cir.1995); *Lewis v. Intermedics Intraocular, Inc.,* 56 F.3d 703, 706 (5th Cir.1995). A plaintiff may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability not set forth in the LPLA. La.Rev.Stat. Ann. § 9:2800.52 (West 1988). The LPLA provides that a manufacturer of a product is liable to a claimant for damage "proximately caused" by a characteristic of the product that rendered it "unreasonably dangerous" when the damage arose from a reasonably anticipated use of the product by the "claimant or another person or entity." *Id.* at § 9:2800.54A. A claimant may prove that the product was "unreasonably dangerous" only under one of the following four theories: (1) that it was unreasonably dangerous in construction or composition; (2) that it was unreasonably dangerous in design; (3) that it was unreasonably dangerous because of inadequate warning; or (4) that it was unreasonably dangerous because of nonconformity to an express warranty. *Id.* at § 2800.54(B)(1-4). Thus, the elements of a products liability cause of action under the LPLA are proof of the following:

1. that the defendant is a manufacturer of the product;

2. that the claimant's damage was proximately caused by a characteristic of the product;

3. that the characteristic made the product unreasonably dangerous

13

in one of the four ways provided in the statute; and

4. that the claimant's damage arose from a reasonably anticipated
   use of the product by the claimant or someone else.

*Id.* § at 2800.54; *see generally,* J. Kennedy, *A Primer on the Louisiana Products Liability Act,* 49 La. L.Rev. 565 (1989) (hereafter "Kennedy"). While the statutory ways of establishing that a product is unreasonably dangerous are predicated on principles of strict liability, negligence, or warranty, respectively, neither negligence, strict liability, nor breach of express warranty is any longer viable as an independent theory of recovery against a manufacturer. *See Automatique New Orleans, Inc. v. U-Select-It, Inc.,* 1995 WL 491151 at *3 n. 2 (E.D.La. Aug.15, 1995) (no independent negligence claim); *Hopkins v. NCR Corp.,* 1994 WL 757510 at *1-2 (M.D.La. Nov.17, 1994) (strict liability under article 2317 not cognizable theory against manufacturer); Kennedy, *supra,* at 589-90. Further, breach of implied warranty or redhibition is not available as a theory of recovery for personal injury, although a redhibition action is still viable against the manufacturer to recover pecuniary loss. Kennedy, *supra,* at 588.

It is apparent from the foregoing discussion of the exclusivity of the LPLA that plaintiff's allegations of negligence, fraud by misrepresentation, market share liability, breach of implied warranty of fitness and civil conspiracy fail to state a claim against the lead paint pigment manufacturers under the LPLA and must therefore be dismissed. *See Brown v. R.J. Reynolds Tobacco Co.,* 852 F.Supp. 8 (E.D.La.1994), *aff'd,* 52 F.3d 524 (5th Cir.1995) (summarily dismissing claims for fraudulent

14

misrepresentation, concealment and conspiracy); *Hopkins v. NCR Corp.,* 1994 WL 757510 (M.D.La. Nov.17, 1994), *aff'd,* 53 F.3d 1281 (5th Cir.1995) (plaintiff could not bring separate strict liability action against manufacturer as "lessor or owner" under La. Civ.Code Ann. art. 2317 because of preemptive force of LPLA).

Plaintiff does attempt to assert a claim for defective design, failure to warn, and breach of express warranty, which are cognizable liability theories under the LPLA. However, these claims are likewise defective because nowhere in the complaint does plaintiff identify the manufacturer whose product caused her injury. Plaintiff contends that product identification, or identification of the manufacturer whose product caused her injury, is not required under the LPLA. She claims that the theory of market share liability, under which liability is imposed on the basis of each manufacturer's share of the product market, can serve as a surrogate for identification of the manufacturer of the product that caused her damage. Plaintiff also relies on a civil conspiracy theory to argue that solidary liability may be imposed on the manufacturers under article 2324 of the Louisiana Civil Code for conspiring to promote lead paint pigment fraudulently. The Court has already found that civil conspiracy and fraudulent misrepresentation are not cognizable liability theories under the Louisiana Products Liability Act. Nor can market share liability serve as a liability theory under the Act. The Court now addresses whether market share theory, if not a cause of action, can nevertheless serve as an alternative theory of causation under the

15

LPLA.  The Court concludes that it cannot.

### i. Product Identification –
*An Element of a Products Liability Claim*

Plaintiff's obligation to identify the manufacturer of the allegedly defective product is inherent in the LPLA's requirement that plaintiff prove proximate causation.  The statute provides in Section 2800.54(A) that

> the manufacturer of a product shall be liable to a claimant for damages *proximately caused* by a characteristic of the product .... (emphasis added).

Section 2800.54(D) states that plaintiff has the burden of proving the elements of Subsection 2800.54(A).  Plaintiff thus has the burden of proof that a manufacturer's product proximately caused her injury.  In addition, the statute provides that the LPLA "establishes the exclusive theories of liability for manufacturers for damage *caused* by their products."  *Id.* at § 2800.52 (emphasis added).  Further, Louisiana courts require the identification of a product's manufacturer in product liability cases.  In a pre-LPLA case, the Fifth Circuit, applying Louisiana law, required identification of the manufacturer as an element of plaintiff's product liability claim in *Aymond v. Texaco, Inc.,* 554 F.2d 206, 211 (5th Cir.1977).  Louisiana state courts did so as well.  *See Fricke v. Owens-Corning Fiberglas Corp.,* 618 So.2d 473, 475 (La.App.1993) (pre-1988 accident) ("we cannot abandon general rule of products liability requiring identification of the product with the manufacturer"); *Harrison v. Gulf S. Beverages, Inc.,* 438 So.2d 261, 262 (La.App. 4th Cir.), *writ denied,* 443 So.2d 582 (La.1983);

16

*Simms v. Baton Rouge Coca-Cola Bottling Co.,* 469 So.2d 52, 54 (La.App. 1st Cir.1985), *writ denied,* 470 So.2d 882 (La.1985); *Roberts v. Louisiana Coca-Cola Bottling Co.,* 566 So.2d 163, 167 (La.App. 4th Cir.1990). After the adoption of the LPLA, Louisiana courts have likewise required identification of the manufacturer of the defective product. *See, e.g., Baldwin v. Kikas,* 635 So.2d 1324, 1327 (La.App. 4th Cir.1994), *writ denied,* 643 So.2d 144 (La.1994) (affirming summary judgment because of insufficient evidence of identity of manufacturer or seller); *see also Maldanado v. State Through*

APPENDIX A—Continued

*Dept. of Transportation,* 618 So.2d 537, 538-39 (La.App. 4th Cir.1993), *writ denied,* 623 So.2d 1309 (La.1993) (proof of identity of manufacturer is element of plaintiff's claim).

Market share liability has never been adopted by a Louisiana court. The theory was first developed by the California Supreme Court in *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), a diethylstilbestorol ("DES") case. There, plaintiff was unable to identify the manufacturer of the DES that her mother took while she was pregnant, which caused the plaintiff's injury. As a result, the court shifted the burden to the industry defendants to prove that they could not have been the manufacturer of the product causing plaintiff's injury. If a defendant could not exculpate itself, it would be liable for a resulting judgment in proportion to its share of the DES market at the time at issue.

17

As noted, no Louisiana decision has ever applied this theory to supplant proof of proximate causation. Moreover, the Fifth Circuit has twice refused to find that market share theory could be applied under Louisiana law. In 1983, in *Thompson v. Johns-Manville Sales Corp.,* 714 F.2d 581 (5th Cir.1983), the Fifth Circuit, sitting in diversity, refused to apply market share liability in an asbestos products liability case controlled by Louisiana law. The court reasoned that Louisiana courts had not adopted the theory and that such a radical expansion of tort liability was for Louisiana courts in the first instance. *Id.* at 583. Three years later, in *Bateman v. Johns-Manville Sales Corp.,* 781 F.2d 1132, 1133 (5th Cir.1986), the Fifth Circuit followed its earlier ruling in *Thompson* and held that it was for the State of Louisiana to decide for itself to "make the major policy change of adopting the market share theory." *Id.* at 1133. The Louisiana legislature adopted the LPLA after both *Bateman* and *Thompson,* and it did not include market share liability as an alternative to traditional proof of proximate causation. Thus, since there is no intervening Fifth Circuit or controlling Louisiana precedent to the contrary, this Court is bound by the Fifth Circuit's decisions in *Thompson* and *Bateman.*

Apart from the constraints imposed by precedent, this Court is skeptical of the wisdom of imposing market share liability in a case such as this. Here, the connection between plaintiff's unfortunate injury and defendants' alleged wrongful conduct is separated by anywhere from 20 to 70 years. Plaintiff concedes that

18

lead paint pigment has not been applied for residential purposes since at least 1972, 20 years before this plaintiff was born, and most of the wrongful conduct in the complaint allegedly took place between 1917 and the 1950's. Plaintiff does not even allege when the lead paint pigment was applied to the source of her exposure. Nor does plaintiff allege that defendant's market share should be determined as of any particular time. She simply alleges that "each pigment defendant is liable to plaintiffs for its proportionate share of lead pigment produced and sold." Complaint at ¶ 44. This would appear to mean liability based on a defendant's share of the total production of lead pigment over the total period it was produced and sold. In *Sindell,* where market share liability was applied, plaintiff could narrow the time of her exposure and of the sale of the DES to the time when her mother was pregnant, at which point the existing manufacturers could be ascertained. Here, while Schanta Jefferson was apparently exposed to lead paint pigment sometime after her birth in 1992, the lead paint pigment had to have been applied more than 20 years before that, and plaintiff does not allege when in this century that this application occurred. Even courts using market share liability have limited each defendant's liability to the proportion of the judgment "which reflects the share of the market supplied by the defendant *at the time* of said encounter." *Santiago v. Sherwin Williams Co.,* 3 F.3d 546, 550 (1st Cir.1993) (citing cases) (emphasis added). Plaintiff apparently contemplates a less finely tuned application of the doctrine here. Further, as defendants

19

point out, not all manufacturers of lead pigment are defendants in the case. Eagle-Picher, described in plaintiff's complaint as a "major producer of white lead and a member of the LIA," is not a defendant. *See* Complaint at ¶ 88. In sum, with no allegation of when the pigment was applied, or that defendants' market shares were constant over the whole period that lead pigment was used, and with a "major producer" absent from the case, the Court finds that market share theory would create too much risk that a defendant will be held liable for more harm than it caused, or, worse yet, without causing any harm at all to the plaintiff. *See Santiago,* 3 F.3d at 550-52 (rejecting market share liability in lead paint case for similar reasons).

For all of the foregoing reasons, the complaint against the pigment manufacturers must be dismissed for failure to state a legally cognizable claim to relief.

b. *Lead Industries Association, Inc.*

Lead Industries Association, Inc. is alleged to be a New York corporation. It is not alleged to have manufactured or sold lead paint pigment. The LPLA applies only to manufacturers, and its causes of action do not lie against an incorporated trade association not alleged to have acted as a manufacturer. *See Baldwin v. Kikas,* 635 So.2d 1324 (La.App. 4th Cir.1994) (nonmanufacturer or nonseller not liable for negligence or strict liability under LPLA). Further, a warranty action does not lie against one who neither sells nor manufactures a product. *See Rowell v. Carter Mobile Homes, Inc.,* 500 So.2d 748 (La.1987) (bank

20

not liable in warranty); *cf. Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168 (5th Cir.1996) (Texas law). Plaintiff has not even asserted market share liability against the LIA. *See* Complaint at ¶ 44.

The gravamen of plaintiff's allegations against the LIA are that it conspired with the pigment defendants to promote lead pigment through fraudulent misrepresentations. Louisiana law does not recognize an independent cause of action for civil conspiracy. *See Louisiana v. McIlhenny,* 201 La. 78, 9 So.2d 467, 472 (1942); *Junior Money Bags, Ltd. v. Segal,* 798 F.Supp. 375, 379 (E.D.La.1990); *Silver v. Nelson,* 610 F.Supp. 505, 516 n. 15 (E.D.La.1985). Rather, Louisiana Civil Code article 2324 provides that "he who conspires with another person to commit an intentional or willful act is answerable in solido with that person for the damage caused by such act." La. Civ.Code Ann. art. 2324 (West 1988). The actionable element under article 2324 is the intentional tort the conspirators agreed to commit and committed in whole or in part causing plaintiff's injury. *See Kiva Constr. & Engineering v. International Fidelity Insurance Co.,* 749 F.Supp. 753, 756 (W.D.La.1990); *Silver,* 610 F.Supp. at 516. Plaintiff asserts that the underlying tort here is fraudulent misrepresentation: "the knowingly fraudulent misrepresentation of the properties of lead pigment." Plaintiff's Opp. Mem. at 15. However, plaintiff's conspiracy to commit fraudulent misrepresentation claim is defective because the underlying fraudulent misrepresentation claim is defective.

Louisiana Civil Code article 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may result from silence or inaction." La. Civ.Code art.1953. An element of a Louisiana claim for fraudulent misrepresentation is justifiable reliance. *See Abbott v. Equity Group, Inc.,* 2 F.3d 613, 624 (5th Cir.1993); *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1131 n. 33 (5th Cir.1988); *Silver,* 610 F.Supp. at 516.[15] Nowhere in the complaint does plaintiff allege that she bought, used, or ingested the lead paint pigment in reliance on defendants' misrepresentations. Indeed, it would appear impossible for the injured plaintiff to allege that she ingested the lead pigment in justifiable reliance on the asserted misrepresentations of defendants since they were made before she was born, and the dangers of lead pigment were so publicly known that it was banned by law for residential use 20 years before her birth. *Cf. City of Philadelphia v. Lead Industries, Inc.,* 1992 WL 98482 at *6 (E.D.Pa.1992) (discussing similarly defective fraudulent misrepresentation claim). Hence, the claim of fraudulent misrepresentation is defective as a matter of law.

In addition, plaintiff's fraudulent misrepresentation claim against the LIA is defective because of a failure to allege causation. Plaintiff's complaint does not allege that the

---

[15]The same is true if the claim were for negligent misrepresentation. *See Abbott v. Equity Group, Inc.,* 2 F.3d 613, 624 n. 38 (5th Cir.1993).

fraudulent promotional activities of the LIA caused her lead poisoning. *See Santiago, supra,* 3 F.3d at 552 (noting same defect). She simply alleges that if defendants had not engaged in fraudulent activity, lead pigment would not have been sold in America for residential use. Complaint at ¶ 52. While plaintiff argues in her brief that "but for" the fraudulent promotional activities of the LIA and the pigment defendants, no paint would have been used residentially and hence no paint would have been used in her apartment, not even this much is alleged in her complaint.

For all of the foregoing reasons, the amended complaint fails to state a claim against the LIA.

4. *CONCLUSION*

The amended complaint is ordered dismissed against all defendants.

New Orleans, Louisiana, this _____ day of _____, 1996.

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

23